UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

                Plaintiff,

v.                                              Case No. 17-CR-204

DANIEL KOSOSKI,

                Defendant.

---

**UNITED STATES' SENTENCING MEMORANDUM**

---

The United States of America, by and through its attorneys, Matthew D. Krueger, United States Attorney, and Kelly B. Watzka, Assistant United States Attorney, hereby submits this memorandum to aid the Court in sentencing the defendant, Mr. Kososki. For the reasons set forth below, the defendant's conduct warrants a prison sentence. The United States respectfully requests that the Court adopt the parties' joint recommendation and impose a sentence of a year and a day in prison.

    **I.**    **Introduction**

This case is not about whether Mr. Kososki, while stationed in Germany during peacetime in the 1980's, was seriously injured during a motor vehicle accident in which he was the passenger of a vehicle believed to be operated by an impaired driver. No one disputes that the defendant sustained serious injuries as result of that accident. This case is about whether approximately twenty years later the residual effects of the defendant's injuries prevented him from engaging in substantial gainful employment and entitled him to Individual Unemployability ("IU") benefits, as he first swore to the Veteran's Administration ("VA") in 2006 – and continued to do so through 2017. This is a case about

a liar who repeatedly insisted he was physically and mentally incapable of working while first earning in excess of $80,000 a year as a financial consultant, and then while operating a lucrative bar and restaurant in Costa Rica as well as conducting Harley-Davidson motorcycle tours around the country.

## II.     Applicable Legal Standards

In choosing a reasonable sentence, this Court must consider all of the factors set forth in 18 U.S.C. § 3553(a). *United States v. Harris*, 490 F.3d 589, 593 (7th Cir. 2007). Those factors include:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) the need for the sentence imposed-
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>> (B) to afford adequate deterrence to criminal conduct;
>> (C) to protect the public from further crimes of the defendant; and
>> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
> (4) the advisory guideline range;
> (5) any pertinent policy statements issued by the Sentencing Commission;
> (6) the need to avoid unwarranted sentence disparities; and
> (7) the need to provide restitution to any victims of the offense.

*See* 18 U.S.C. § 3553(a).

A court may conduct a broad inquiry "largely unlimited" in scope and source to determine the appropriate sentence to be imposed upon a defendant. *United States v. Tucker*, 404 U.S. 443, 446-47 (1972). Indeed, 18 U.S.C. § 3661 provides that:

2

> No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.

When read in conjunction with 18 U.S.C. § 3553(a), Congress has clearly directed district courts to impose sentences which reflect the reality and totality of the defendant's conduct and character. When evaluating a defendant's conduct at sentencing, the Court should also consider all relevant conduct of the defendant. *See* U.S.S.G. § 1B1.3(a).

### III. Sentencing factors under 18 U.S.C. § 3553

The factors set forth in 18 U.S.C. § 3553 provide the Court with a framework to determine the seriousness of his offense and demonstrate why a substantial prison sentence is necessary.

#### A. The nature and circumstances of the offense

For years, Mr. Kososki orchestrated a scheme to defraud the VA and then, once he became aware that the VA was investigating his entitlement to IU benefits, he attempted to minimize his conduct and blame others. He still maintains that some unnamed VA representative told him that he was "unemployable," and provided him with paperwork to sign that he didn't fully understand. *See* PSR ¶ 23. He maintains that the VA told him he could not work. See PSR ¶¶ 69, 74.

By way of background, VA compensation benefit payments are paid to veterans who were disabled by injury incurred or aggravated during active duty military service. Individual Unemployability (IU) is a part of the VA's disability compensation program that pays at the 100% rate if an eligible veteran is unable to maintain substantially gainful employment as a result of his service-connected disability or disabilities. Veterans who receive IU benefits may work in a "marginal" capacity but may not earn their livelihood with earnings comparable to the occupation in the community where the veteran resides.

3

Mr. Kososki served in the United States Army from November 1982 until June 1987. Thereafter, he applied for and was awarded disability benefits for injuries stemming from a car accident in which he was the passenger while on active duty.

On January 23, 2006, Mr. Kososki applied for IU benefits based upon his claim that head trauma from the car accident had caused severe headaches, which prevented him from working. As part of the application process, Mr. Kososki submitted various forms to the VA in which he certified that he was too disabled to work and had not worked since October 2005. Mr. Kososki was also required to undergo periodic medical examinations at the VA Medical Center in Milwaukee. During an examination on August 7, 2006, Mr. Kososki stated that he was bedridden three days per week because of severe headaches. He further stated that the headaches caused his vision to be blurred, which made him unable to read, watch television, and drive.

On July 29, 2008, Mr. Kososki was granted IU status retroactively to December 12, 2005. Since that time, monthly IU benefits have been wired to an account maintained by Mr. Kososki in Appleton, Wisconsin.[1] Thereafter, Mr. Kososki was required to periodically submit Employment Questionnaires certifying that he had not worked or been self-employed in the past 12 months. Mr. Kososki signed and sent those forms to the Milwaukee VA in 2010, 2012, 2013, and 2016.

Later, Mr. Kososki claimed that the headaches also caused him to be depressed and suffer from debilitating social anxiety. During an examination on June 3, 2015, Mr. Kososki reported to the VA doctor that he suffered from anxiety that was most severe when he was in public around strangers. Mr. Kososki further reported experiencing a general sense of avoidance and stated that

---

[1] Mr. Kososki never reported his residence in Costa Rica to the VA. He had all of his correspondence with the VA sent to a home he maintained in Wisconsin.

4

he was most comfortable being at home. As a result, he claimed to have lost meaningful friendships and had no ability to engage in hobbies and recreation.

In fact, Mr. Kososki worked continuously during this time period. First, he was employed as a consultant at Harbour Investments, Inc. in Appleton, Wisconsin. According to the business owner, Mr. Kososki came and went from work on a regular basis and never took off of work due to illness or injury. He left the company in May 2008 due to a business dispute, not because of incapacity. Harbour Investments issued IRS 1099-MISC forms documenting compensation paid to Kososki in the amounts of $82,570.68 in 2006, $43,814.24 in 2007, and $7,924.31 in 2008.

Next, Mr. Kososki and his friend bought Coconutz, a bar and restaurant in Costa Rica, which Mr. Kososki operated until he sold the business in the summer of 2017. Although Mr. Kososki has suggested that he was only a minority owner who saw the bar as an investment opportunity and who had limited involvement in the business operations, the evidence demonstrates otherwise. Coconutz advertised that it "was established by 2 guys that wanted to get away from the bullshit. They came to Costa Rica to go scuba diving, got drunk and bought a bar . . ." *See* Exhibit A, filed herewith. Witnesses, including his business partner, several Coconutz employees, and the woman to whom Mr. Kososki was married at the time he bought the bar, state that he handled many aspects of the business operations from handling payroll, tending bar, planning the menu, ordering supplies, and interacting with customers. According to witnesses, Mr. Kososki was at the bar on a full time basis. Text message exchanges with his ex-wife and publically shared photographs on the Coconutz Facebook page corroborate their statements. *See* Exhibits B, C, D, E, and F, filed herewith. Witness statements and photographs also paint a picture

5

of a man who enjoys socializing and being the center of attention – instead of the anxious, depressed, recluse that Mr. Kososki characterized himself as to the VA.

By all accounts, Coconutz was regularly packed and highly profitable. According to witnesses, it generated a significant cash income and Mr. Kososki routinely asked visiting friends and family members to carry large sums of cash back to the United States, where he maintained a second home, for him. In addition to defrauding the VA, it does not appear that Mr. Kososki reported any of this income to the IRS.

In addition to his work at Coconutz, Mr. Kososki operated a Harley-Davidson motorcycle tour company called "HD Devil's Paradise Tours." See Exhibit I, Facebook posting of photographs from a tour, filed herewith. According to the company website, the company conducted day-long and multi-day motorcycle tours around Costa Rica. Mr. Kososki is depicted at times leading such tours. It is unclear whether this business is still in operation now that Mr. Kososki has moved back to the United States.

Riding motorcyles is clearly a passion for Mr. Kososki. Only a few months after he told the VA that he could no longer participate in recreational activities due to his headaches and extreme social anxiety, he participated in "motorcycle weekend" in Puntarenas, Costa Rica. *See* Exhibits G and H, filed herewith. Mr. Kososki does not appear to be suffering from any such mental or physical impairment.

At bottom, Mr. Kososki lead a double life for more than ten years. While holding himself out to the VA as a broken man who was so debilitated by service-connected disabilities that he could barely function, Mr. Kososki lead what appears to be a very charmed life, operating successful businesses and enjoying recreational activities, in Costa Rica. The longstanding nature

6

of his offense conduct and his repeated lies are aggravating factors the Court should consider in imposing sentence.

### B. The history and characteristics of the defendant

Mr. Kososki served his country honorably, a factor that reflects well on his character.

He has had a stable and consistent work history, a factor that does not weigh in his favor in this particular case.

Mr. Kososki has had relatively few contacts with the criminal justice system. However, his prior convictions are somewhat concerning because they occurred when he was 37 and 38 years old – in other words, old enough to know better. His 2002 theft and disorderly conduct conviction involves conduct similar to the instant offense – namely an effort motivated by greed and furthered by deceitful conduct - to get something to which he was not entitled. Mr. Kososki's 2003 unlawful phone use conviction is more concerning, as it reflects a volatile temper and involved violent threats.

### C. The need to promote respect for the law and provide just punishment

At times, Mr. Kososki has demonstrated a lack of respect for these criminal proceedings. Mr. Kososki is an individual who has struggled to fully accept responsibility for his conduct, as evidenced by his comments to the press during the early stages of the criminal proceedings, his public Facebook postings, his statements during the change of plea hearing, and his comments in the PSR.

The letters of recommendation filed in this case represent the views of Mr. Kososki's friends and relatives. He should not be punished for the opinions of third parties. However, their comments are telling and somewhat concerning to the United States. Most of the individuals who wrote letters on Mr. Kososki's behalf insist that he never worked at Coconutz. Of course, their assertions completely contradict the conduct that Mr. Kososki has admitted by virtue of his guilty plea. They also contradict

7

the evidence in this case, namely countless photographs, text messages, and witness statements that prove otherwise. One of the letters also contradicts the author's sworn statement to law enforcement. *See* Exhibit J, Memorandum of Interview of Barbra McCulloch, filed herewith.

Perhaps these comments simply reflect the misguided efforts of those who care for the defendant to help him. However, it's also possible that the defendant has fueled those comments by refusing to accept responsibility outside of the courtroom. If that is the case, the Court should be concerned about the possibility of recidivism.

### D. The advisory guidelines range

The sentencing range set forth in the PSR, while advisory, is an important consideration in determining a reasonable sentence. With a total offense level of 16, and a criminal history category of II, Mr. Kososki's advisory guidelines range is 24 to 30 months' imprisonment. In selecting an appropriate sentence, the Court may consider the fact that Mr. Kososki's guidelines range, which reflects the totality of his conduct, exceeds the parties' joint recommendation.

In recommending a below-guidelines sentence, the United States has already taken into account arguably mitigating factors, such as the defendant's attempts to pay some of the restitution he owes to the VA and the defendant's health.

### E. The need for specific and general deterrence

The United States respectfully requests that the Court consider deterrence as a compelling sentencing factor in this case. "Because economic and fraud-based crimes are 'more rational, cool, and calculated than sudden crimes of passion or opportunity' these crimes are 'prime candidate[s] for general deterrence." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir 2006). Further, "as the legislative history of the adoption of § 3553 demonstrates, Congress viewed deterrence as 'particularly important in the area of white collar crime." *Id.* (other citations omitted).

8

These principles were reaffirmed in *United States v. Peppel*, 707 F.3d 627 (6th Cir. 2013). In *Peppel*, the court referenced the need to implement a meaningful custodial sentence in fraud cases, even when "it was undisputed at the time of sentencing that [a defendant's] past history was exemplary." *Id*. at 638; *see also United States v. Warner*, 792 F.3d 847, 860 (7th Cir. 2015) (noting that general deterrence is an important goal of sentencing for white collar defendants "because they (presumably) act rationally, calculating and comparing the risks and the rewards before deciding whether to engage in criminal activity."). And the Seventh Circuit has further explained that in general, "[t]he system of penalties under the Guidelines is constructed on the belief that higher fines, and longer sentences of imprisonment, are more effective deterrents. A large body of evidence supports this intuition." *United States v. Turner*, 998 F.2d 534, 536 (7th Cir. 1993).

Here, Mr. Kososki's scheme was calculated – the Court should reject any suggestion that he did not understand what he was doing when he signed multiple sworn statements over the course of many years that contained his claims that he had not worked since October 2005 and would be "too disabled" to work in the future. Mr. Kososki also repeated those claims when he appeared for periodic examinations at the VA. And, he and others (namely his wife and brother) repeated those lies under oath when they appeared for a hearing at the VA in 2017 after he was notified that his eligibility for IU benefits had been called into question.

Mr. Kososki's scheme was possible, in part, because the VA must rely on the honesty and integrity of the veterans it serves. Mr. Kososki apparently has lingering physical ailments – but he clearly exaggerated the extent to which those issues impaired his ability to work. He also seemingly manufactured a social anxiety disorder – a condition that the VA doctor accepted based upon the defendant's self-serving statements, which were difficult to objectively assess. The impact of the defendant's conduct went beyond his unlawful receipt of IU benefits. Those, like Mr. Kososki, who

9

abuse the system undermine the VA's ability to efficiently provide support to veterans who legitimately qualify for IU benefits.

For these reasons, general and specific deterrence are factors the Court should consider in imposing sentence.

**IV.** **Conclusion**

Based on the foregoing, the government respectfully requests that this Court adopt the parties' recommendation and impose a sentence of a year and a day in prison.

Dated at Milwaukee, Wisconsin, this 31st day of August, 2018.

    Respectfully submitted,

    MATTHEW D. KRUEGER
    United States Attorney

By:

    s/Kelly B. Watzka
    Deputy Criminal Chief
    Wisconsin Bar Number 1023186
    E-Mail: kelly.watzka@usdoj.gov
    Attorney for Plaintiff
    Office of the United States Attorney
    517 East Wisconsin Avenue, Room 530
    Milwaukee, Wisconsin 53202
    Telephone: (414) 297-1700
    Fax: (414) 297-1738